

12 CIV 7530

PREET BHARARA
United States Attorney for the
Southern District of New York
By: SARAH E. PAUL
Assistant United States Attorney
One St. Andrew's Plaza
New York, New York 10007
Tel. (212) 637-2326

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x
UNITED STATES OF AMERICA,                    :

        Plaintiff,                          :

    - v -                                    :

ANY AND ALL FUNDS                            :
ON DEPOSIT AT JPMORGAN CHASE
ACCOUNT NUMBER 61442003
HELD IN THE NAME OF CIA MINERA               :
AURIFERA SANTA ROSA SA, AKA COMARSA,
                                             :

ANY AND ALL FUNDS
ON DEPOSIT AT ESPIRITO SANTO BANK            :
ACCOUNT NUMBER 106193054
HELD IN THE NAME OF
PACIFIC GATEWAY CORPORATION,                 :

                                             :

ANY AND ALL FUNDS
ON DEPOSIT AT WELLS FARGO                     :
ACCOUNT NUMBER 2000045521021
HELD IN THE NAME OF                          :
PACIFIC GATEWAY CORPORATION,

                                             :

ANY AND ALL FUNDS
ON DEPOSIT AT JPMORGAN CHASE                  :
ACCOUNT NUMBER 000000891772402
HELD IN THE NAME OF                          :
ADVANCER LOGISTICS LLC,

                                             :

ANY AND ALL FUNDS
ON DEPOSIT AT BB&T                           :
INTERNATIONAL SERVICES
ACCOUNT NUMBER 240048353                     :

**VERIFIED COMPLAINT**

12 Civ.



RECEIVED
OCT 09 2012
U.S.D.C. S.D. N.Y.
CASHIERS

HELD IN THE NAME OF                         :
ADVANCER LOGISTICS LLC,

                                              :

ANY AND ALL FUNDS
ON DEPOSIT AT BANK OF AMERICA         :
IN ANY AND ALL ACCOUNTS
HELD IN THE NAME OF                     :
CARLOS SANCHEZ ALAYO,

                                              :

ANY AND ALL FUNDS
ON DEPOSIT AT WELLS FARGO             :
ACCOUNT NUMBER 2000043301201
HELD IN THE NAME OF                     :
REPUBLIC METALS,

                                              :

ANY AND ALL FUNDS
ON DEPOSIT AT UNICREDIT               :
AKA HYPOVEREINS (NEW YORK BRANCH)
ACCOUNT NUMBER 1100010868             :
HELD IN THE NAME OF
ITALPREZIOSI SPA,                      :

ANY AND ALL FUNDS                      :
ON DEPOSIT AT BANCA INTESA
(NEW YORK BRANCH)                     :
ACCOUNT NUMBER 124050810001
HELD IN THE NAME OF                     :
ITALPREZIOSI SPA,

                                              :

ANY AND ALL FUNDS
ON DEPOSIT AT BANCO DE COMERCIO   :
IN LIMA, PERU
ACCOUNT NUMBER 02304511002029307486  :
HELD IN THE NAME OF
HORIZONTE DORADO SRL,               :

ANY AND ALL FUNDS                      :
ON DEPOSIT AT BANCO DE COMERCIO
IN LIMA, PERU                          :
ACCOUNT NUMBER 02304512002007515282
HELD IN THE NAME OF                     :
CIA MINERA SAN SIMON, and

                                              :

ANY AND ALL FUNDS
ON DEPOSIT AT BANCO DE COMERCIO   :
IN LIMA, PERU

```
ACCOUNT NUMBER 110020258939          :
HELD IN THE NAME OF
CIA MINERA AURIFERA SANTA ROSA       :
AKA COMARSA,
                                     :
          Defendants-in-rem.
-----------------------------------------x
```

Plaintiff United States of America, by its attorney, Preet Bharara, United States Attorney for the Southern District of New York, for its verified complaint alleges upon information and belief as follows:

## I.  JURISDICTION AND VENUE

1.  This action is brought pursuant to Title 18, United States Code, Section 981(a)(1)(A) and Title 21, United States Code, Section 881(a)(6) by the United States of America seeking the forfeiture of the following property:

(a)  Any and all funds on deposit at JPMorgan Chase Account Number 61442003, held in the name of CIA Minera Aurifera Santa Rosa SA AKA COMARSA ("COMARSA ACCOUNT-1");

(b)  Any and all funds on deposit at Espirito Santo Bank Account Number 106193054, held in the name of Pacific Gateway Corporation ("PACIFIC ACCOUNT-1");

(c)  Any and all funds on deposit at Wells Fargo Account Number 2000045521021, held in the name of Pacific Gateway Corporation ("PACIFIC ACCOUNT-2");

(d)  Any and all funds on deposit at JPMorgan Chase Account Number 000000891772402, held in the name of Advancer Logistics LLC ("ADVANCER ACCOUNT-1");

(e)  Any and all funds on deposit at BB&T International Services Account Number 240048353, held in the name of Advancer Logistics LLC ("ADVANCER ACCOUNT-2");

(f)  Any and all funds on deposit at any and all accounts held at Bank of America in the name of Carlos Sanchez Alayo (the "CARLOS ALAYO ACCOUNTS");

(g)  Any and all funds on deposit at Wells Fargo Account Number 2000043301201, held in the name of Republic Metals (the "REPUBLIC METALS ACCOUNT");

(h)  Any and all funds on deposit at Unicredit AKA Hypovereins Account Number 1100010868, held in the name of Italpreziosi SPA ("ITZALPREZIOSI ACCOUNT-1");

(i)  Any and all funds on deposit at Banca Intesa Account Number 124050810001, held in the name of Italpreziosi SPA ("ITZLPREZIOSI ACCOUNT-2");

(j)  Any and all funds on deposit at Banco De Comercio Account Number 02304511002029307486, held in the name of Horizonte Dorado SRL (the "HORIZONTE DORADO ACCOUNT");

(k)  Any and all funds on deposit at Banco De Comercio Account Number 02304512002007515282, held in the name of CIA Minera San Simon (the "SAN SIMON ACCOUNT"); and

(l)  Any and all funds on deposit at Banco De Comercio Account Number 110020258939 held in the name of CIA Minera Aurifera Santa Rosa AKA COMARSA ("COMARSA ACCOUNT-2"). (a through l collectively, the "Defendant Property").

2.  This Court has jurisdiction over this action pursuant to Title 28, United States Code, Sections 1345 and 1355.

3.  Venue is proper under Title 28, United States Code, Section 1355(b)(1)(A) because acts and omissions giving rise to forfeiture took place in the Southern District of New York.

## II.  PROBABLE CAUSE FOR FORFEITURE

### A.  BACKGROUND

4.  Narcotics traffickers typically amass large amounts of cash proceeds from the sale of narcotics in the United States.  The traffickers, or those associated with the traffickers, frequently attempt to give the impression of legitimacy to these profits: i.e., "launder" them by making the profits appear to have been generated by a legitimate source. The traffickers must also devise various methods to remit those

narcotics proceeds to suppliers of narcotics located in Colombia and other South American countries, which are known source locations of narcotics, without alerting governmental or law enforcement agencies in either country.

5.     In order to accomplish these goals, narcotics traffickers frequently utilize domestic and foreign banks and/or financial institutions in order to both make their narcotics profits appear to be from legitimate sources and move those profits through the financial system into the countries where narcotics are produced.

6.     These efforts frequently utilize "shell operations," or businesses that purport to be legitimate businesses, but which in actuality have no assets or employees. Additionally, these efforts will often include numerous transfers of funds between accounts and businesses for no apparent or legitimate reason.  This process is called "layering" and involves adding layers of financial transactions between the illegal transaction that generated the funds and the ultimate destination of the funds in order to give the appearance of legitimacy to the funds and to make it harder to trace the funds back to an illicit source.

7.     Very often this practice of "laundering" narcotics proceeds will also include the use of nominees' names

in order to hide the launderer's true identity. Frequently, these nominees are family members of the launderer. However, despite the use of the nominees' names, the launderer retains true dominion and control over the narcotics proceeds.

8. Members of the Sanchez-Paredes family have been involved in narcotics trafficking for decades, both in Peru and on an international level. In fact, Peruvian law enforcement authorities have placed a number of the members of the Sanchez-Paredes family on a drug trafficking watch list. The Peruvian drug trafficking watch list is similar to the U.S. Kingpin Act, which lists the most wanted narcotics traffickers in the world.

9. The Peruvian National Prosecutor's Office began an investigation of the Sanchez-Paredes drug trafficking organization ("DTO") in approximately 1981. This multi-decade investigation culminated in a criminal complaint (the "Peruvian Criminal Complaint"), which was filed on or about April 16, 2010, against numerous members of the Sanchez-Paredes DTO and several companies run by members of the Sanchez-Paredes DTO. The Peruvian Criminal Complaint is currently pending.

10. At least two members of the Sanchez-Paredes family, Percyles Hermenegildo Sanchez-Paredes ("Percyles") and Segundo Simon Sanchez-Paredes ("Segundo Simon"), were assassinated as a result of their involvement in international

7

narcotics trafficking.  Both Percyles and Segundo Simon, who were brothers, were in the business of supplying cocaine and cocaine base to drug cartels in Colombia and Mexico.  Prior to being assassinated, Percyles and Segundo Simon had been involved in large scale cocaine and money laundering operations since the 1970s, and had amassed millions of dollars from their involvement in narcotics trafficking.

11.  Segundo Simon was assassinated on or about December 11, 1987, at his residence, El Rancho Luna, in Hidaldo, Mexico.  The investigation of Segundo Simon's murder led to the discovery of a cocaine laboratory and 416 kilograms of cocaine at El Rancho Luna.  A cooperating witness ("CW-1"), who has spoken with the Peruvian National Prosecutor's Office, and who previously trafficked narcotics with members of the Sanchez-Paredes family, has advised that the 416 kilograms of cocaine found at Segundo Simon's residence was what remained of a 4,000 kilogram load of cocaine.

12.  Percyles was assassinated in 1991.  Prior to his assassination, Percyles was running the Sanchez-Paredes DTO. Percyles would transport kilogram quantity loads of cocaine from Uchiza-San Martin, Peru, to the airport in Chimbote, Peru, via an aerial transportation service.  Once the cocaine arrived in

Chimbote, Percyles would then arrange the transport of approximately 400 kilograms of cocaine base per week to Mexico.

13. In addition to speaking with CW-1, the Peruvian National Prosecutor's Office has interviewed several individuals who have been associated with the Sanchez-Paredes DTO, and who have provided information about the narcotics trafficking activities of Segundo Simon and other members of the Sanchez-Paredes DTO, including the following individuals: (a) a convicted drug trafficker who received money from Segundo Simon to finance the activities of the Sanchez-Paredes DTO in Peru and Colombia, including the transportation of cocaine to Miami, Florida; (b) a convicted drug trafficker who is considered a leader of the Sanchez-Paredes DTO and who was linked to a 1995 seizure of more than three tons of cocaine in Peru; and (c) a convicted drug trafficker who assisted Segundo Simon in processing cocaine at Segundo Simon's laboratory at El Rancho Luna.

14. Two of Segundo Simon's sons, Fidel Ernesto Sanchez Alayo ("Fidel") and Miguel Angel Sanchez Alayo ("Miguel"), have been investigated for narcotics trafficking. Moreover, four of the siblings of Segundo Simon and Percyles, specifically, Santos Orlando Sanchez-Paredes ("Santos Orlando"), Segundo Manuel Sanchez-Paredes ("Segundo Manuel"), Fortunato

Wilmer Sanchez-Paredes ("Fortunato"), and Amanda Francisca Sanchez-Paredes ("Amanda") have been investigated for narcotics trafficking. The activities for which these members of the Sanchez-Paredes family have been investigated involve the manufacture of cocaine paste, the manufacture, transport and sale of cocaine, and the improper channeling of chemicals and other controlled substances with the intent to distribute.

15. Expert accounting reports prepared in connection with the investigation conducted by Peruvian law enforcement authorities (the "Accounting Reports") reveal that Santos Orlando, Segundo Manuel, and Miguel have claimed substantial amounts of unsubstantiated income over the years.

16. Further, according to CW-1, Fidel – who is the son of Segundo Simon and the nephew of Percyles – partnered with Percyles in managing the Sanchez-Paredes DTO. CW-1 has advised that Fidel assisted Percyles in making aerial transportation arrangements to transport the kilogram quantity loads of cocaine from Uchiza-San Martin, Peru, to the airport in Chimbote, Peru. One particular aerial transportation service had three aircraft, one of which had the capacity to transport 800 kilograms of cocaine. Another source of information, moreover, has reported that at the time of Segundo Simon's death, Fidel was considered one of the main contributors in the cocaine trade in Mexico.

17. CW-1 has also advised that Fidel, along with one of his associates, Ruben Arcadio Santana ("Santana"), smuggled two shipments of 50 and 80 kilograms of cocaine each into the United States. On another occasion, CW-1, Santana, and two other individuals were arrested for their involvement in the shipment of 40 kilograms of cocaine, which was seized in Florida in 1995. CW-1 has advised that Fidel, although not arrested on this occasion, was also involved in the 40 kilogram shipment. CW-1 has further stated that CW-1 had a meeting with Fidel and Santana in the United States in 1992, for the purpose of discussing the drug trafficking business. At the meeting, according to CW-1, Fidel and Santana agreed that Fidel would send drugs from Peru to Miami, Florida, and Santana would arrange for the sale of the drugs upon their arrival in Florida.

18. Peruvian law enforcement authorities have tied members of the Sanchez-Paredes family to a number of entities on both a national and international level, through which they have the ability to layer and disguise narcotics proceeds. Specifically, it is believed that the Sanchez-Paredes family has financed various businesses, including mining companies, farms, real estate investments, transportation companies, vehicle repair shops, and heavy equipment sales, for the purpose of laundering enormous amounts of money stemming from narcotics

trafficking. Additionally, it is believed that Percyles'
children and nephews own companies in Panama for the purpose of
laundering money obtained through illegal activities. The
Peruvian National Prosecutor's Office has reported that the
Sanchez-Paredes family is unable to prove the legal origin of at
least $52 million in revenues that were supposedly generated by
these businesses.

19. For instance, members of the Sanchez-Paredes
family own two purported mining companies, CIA Minera Aurifera
Santa Rosa SA, a/k/a "COMARSA" ("COMARSA") and CIA Minera San
Simon ("SAN SIMON"). In March 2007, the Peruvian authorities
seized approximately 125 tons of calcium oxide, a chemical used
both to mine gold and to produce cocaine. Following the
seizure, the purchasers of the calcium oxide were identified as
COMARSA and SAN SIMON. A review of COMARSA's mining records has
shown that, at various times, the amounts of calcium oxide used
by COMARSA either fell short of or far exceeded the amount
needed to process gold, which suggests that COMARSA is not
actually involved in the business of mining gold, but rather in
the business of producing cocaine. COMARSA's books and records
have been seized by Peruvian authorities as proof of COMARSA's
involvement in drug trafficking activity.

20.   Peruvian law enforcement authorities have reviewed the books of SAN SIMON's supplier, Calcareos e Inversiones Amazones (the "Calcareos Records").   The Calcareos Records show an absence of 179 tons of calcium oxide, which Peruvian authorities believe have been sold to SAN SIMON.

21.   Moreover, with respect to COMARSA, the DEA has spoken to a confidential source (hereinafter "CS-1") who was hired by Wilmer Sanchez-Paredes ("Wilmer"), another member of the Sanchez-Paredes family, and Segundo Manuel to protect shipments of cocaine base which were transported by mules to the COMARSA mine in Lima, Peru.   According to CS-1, COMARSA would process the cocaine base into cocaine HCL; approximately fifteen mules at a time were used to carry 50 kilograms of cocaine base apiece; and security was needed to protect the shipments of cocaine base from being ambushed by armed thieves.

22.   Some of the other companies managed by the Sanchez-Paredes DTO, as discussed in further detail below, appear to be nothing more than shell companies, created for the sole purpose of laundering drug money.

B.   THE DEFENDANT PROPERTY

23.   Members of the Sanchez-Paredes family have used multiple bank accounts, including the accounts containing the Defendant Property, to launder narcotics proceeds derived from

13

the family's cocaine operation, dating back to the 1970s. The accounts used and manipulated by the family for money laundering purposes are those accounts which are: (a) held and owned by individual family members; (b) held by companies owned and operated by the family members; (c) held by employees of the family's businesses; and (d) held by companies who are believed to be involved in money laundering activities.

24. Financial statements from the Federal Reserve Bank of New York show that all of the accounts containing the Defendant Property have either made or received wire transfers of suspected drug money that have passed through the Southern District of New York.

25. In or about September 2012, based upon, among other things, the facts set forth herein, seizure warrants for the Defendant Property were issued out of the United States District Court for the Southern District of New York (the "Seizure Warrants"). Pursuant to the Seizure Warrants, the Drug Enforcement Administration ("DEA") has seized over $31 million of the Defendant Property to date.

COMARSA ACCOUNT-1

26. COMARSA ACCOUNT-1 is an account held in the name of COMARSA at JP Morgan Chase Bank ("Chase"). The COMARSA "mining company" was established in January 1992, following

14

Percyles' assassination in 1991.  As noted above, COMARSA is believed to be engaged in the manufacture of cocaine.

27.   A report by World-Check, which created and maintains a database of heightened risk individuals and organizations, including money launderers, terrorists, and fraudsters, indicates that Miguel is the logistics manager and founder of COMARSA; Fidel is the administration manager and founder; Santos Orlando is the executive president and founder; Fortunato is a founding member; and Percyles's daughters, Mary Ann Sanchez Marinos, Flor Marina, Blanca Azucena, Violeta Valquiria, Margarita Soledad and Rosa Sumilda Sanchez Principe, are founding members.

28.   Despite the fact that a number of the Sanchez-Paredes family members founded COMARSA, Santos Orlando and his son, Orlando Sanchez Miranda ("Orlando Sanchez"), are the only officers listed for COMSARA in the account opening documentation for COMARSA ACCOUNT-1.  Ownership records for COMARSA indicate that Orlando Sanchez is a nominee owner of COMARSA ACCOUNT-1. Upon information and belief, Orlando Sanchez, at the time the account was set up, was made the nominee owner of the account because he had not been investigated for either drug trafficking or money laundering, and could therefore give the account an appearance of legitimacy.

29. Financial documents show that COMARSA ACCOUNT-1 was opened for COMARSA in January 2002. When COMARSA ACCOUNT-1 was opened, it was initially opened at Bear Stearns Securities Corporation ("Bear Stearns"), under account number 567-1009818 ("Account 9818"). On the account opening documentation, Santos Orlando was listed as the President of COMARSA and his son, Orlando Sanchez, was listed as the commercial manager. In a letter dated March 27, 2006, Santos Orlando authorized Bear Stearns to transfer the funds in Account 9818 to an account at Beta Capital bearing the account number 614-42003-1-5-216 ("Account 42003"). Account 42003 is now located at Chase and has become COMARSA ACCOUNT-1.

30. In or about August 2008, due to the narcotics and money laundering investigations involving members of the Sanchez-Paredes family, including Santos Orlando, Segundo Manuel, Fortunato, Fidel, and Miguel, Beta Capital ultimately advised its client, COMARSA, that Beta Capital would no longer service Account 42003, i.e., COMARSA ACCOUNT-1.

31. Accordingly, the funds contained in COMARSA ACCOUNT-1 are believed to be the proceeds of narcotics trafficking activities.

## PACIFIC ACCOUNT-1 AND PACIFIC ACCOUNT-2

32. PACIFIC ACCOUNT-1 is held in the name of Pacific Gateway Corporation ("PACIFIC") at Espirito Santo Bank in Miami, Florida. PACIFIC ACCOUNT-2 is held in the name of PACIFIC at Wells Fargo Bank.

33. PACIFIC is believed to be a shell company owned and operated by members of the Sanchez-Paredes family. PACIFIC has used PACIFIC ACCOUNT-1 to wire funds to the following accounts, among others: (a) an account held by SAN SIMON at Banco De Comercio, bearing the account number 110020286119 (the "6119 Account"), which is now closed; (b) an account held by SAN SIMON at Banco Continental, bearing the account number 0110380010024591 (the "4591 Account"), which is now closed; (c) PACIFIC ACCOUNT-2; and (d) COMARSA ACCOUNT-2. In its corporate records, PACIFIC identifies itself simply as a domestic profit corporation.

34. Wire transfer records reflect the following wire activity transacted by PACIFIC, from PACIFIC ACCOUNT-1: (a) in November and December 2009, PACIFIC wired a total of approximately $19,062,000 to the 6119 Account; (b) from January 2010 to December 2010, PACIFIC wired a total of approximately $106,000,000 to the 6119 Account; (c) in November 2009, PACIFIC wired approximately $3,548,000 to the 4591 Account; (d) in March

2010, PACIFIC wired approximately $100,000 to PACIFIC ACCOUNT-2;
and (e) in January 2011, PACIFIC wired approximately $20,000 to
COMARSA ACCOUNT-2.

35.   According to PACIFIC's filings with the Florida
Department of State Division of Corporations, Miguel, Julio C.
Alva ("Julio"), and Jorge E. Alva ("Jorge"), are officers of
PACIFIC.   Julio and Jorge are believed to be involved in
laundering drug money for Miguel and other members of the
Sanchez-Paredes DTO.   As a former officer of PACIFIC and current
business associate of Miguel, Julio is believed to have
established shell companies for the Sanchez-Paredes family,
including PACIFIC, for the purpose of laundering narcotics
proceeds.   Jorge, an employee of PACIFIC, is believed to be
laundering the family's narcotics proceeds through various
domestic accounts, including the accounts described above.

36.   PACIFIC is believed to be a shell company
because, among other things:   (a) the principal office and
mailing address of the company comes back to a residential home
in Pembroke Pines, Florida; (b) only one or two officers have
been listed for the company; (c) the nature of the business for
the company is not known; (d) the sales volume of the company is
not known; (e) during a two month period in 2010, PACIFIC
received approximately $12,000,000 in wire transfers from

Republic Metals ("REPUBLIC METALS"), a gold refining company (discussed in further detail below); (f) PACIFIC has minimal Internet presence; and (g) the present status of PACIFIC is inactive, according to the Florida Department of State Division of Corporations.

37. The wire transfers conducted by PACIFIC in 2009, 2010, and 2011, described above, appear to have had no legitimate business purpose and, instead, appear to have been conducted to facilitate the narcotics trafficking activities of the Sanchez-Paredes DTO.

## EXIM LOGISTICS ACCOUNT

38. The Sanchez-Paredes family previously maintained an account at Wells Fargo, Account Number 2000059983503, held in the name of Exim Logistics LLC ("Exim"). This account (the "Exim Logistics Account") is not one of the accounts containing the Defendant Property, as the Exim Logistics Account has been liquidated and currently has a zero balance. Nevertheless, because certain wire transfers were made from the Exim Logistics Account to some of the accounts containing the Defendant Property, the Exim Logistics Account is relevant to the instant action.

39. Exim is a company owned and operated by members of the Sanchez-Paredes family in Miami, Florida, and is

classified by business and public records as a transportation business. The Sanchez-Paredes family members who are associated with Exim include three Sanchez-Paredes brothers, specifically, Carlos Sanchez Alayo ("Carlos Alayo"), Manuel Sanchez Alayo ("Manuel") and Simon Sanchez Alayo ("Simon"). Lexis Nexis reports list Carlos Alayo as the President of Exim and Manuel as the Treasurer of Exim. An "Executive Profile" search on the Internet links Simon to Exim through his brothers, Carlos and Manuel. These members of the Sanchez-Paredes family are the siblings of Segundo Manuel, who was placed on the narcotics trafficking watch list in Peru, and whose brothers Percyles and Segundo Simon, as noted in paragraph 10, above, were identified as major international narcotics traffickers and assassinated. Carlos Alayo, Manuel, and Simon have been also identified as targets of the Peruvian National Prosecutor's Office's money laundering investigation involving the laundering of narcotics proceeds by the Sanchez-Paredes DTO.

40. Financial records show that Exim previously conducted its business transactions using the Exim Logistics Account. Exim, through the Exim Logistics Account, made wire transfers to at least the following places: (a) a bank account held by Jorge E. Alva, who, as discussed in paragraph 35, above, is believed to be a member of the Sanchez-Paredes family's drug

trafficking operation; (b) the CARLOS ALAYO ACCOUNT, which, as discussed below, is held by Carlos Alayo, the President of Exim; (c) bank accounts held by Carlos Alayo's brothers, brothers, Manuel and Simon, who, as noted above, are also associated with Exim; (d) a bank account held by Hencorp, a brokerage investment firm; (e) an account held by the Real Estate Club LLC, a property investment firm; and (f) the SAN SIMON ACCOUNT, discussed below.

41. Wire transfer reports show that from June 2010 to November 2011, Exim, through the Exim Logistics Account, executed wire transfers to the SAN SIMON ACCOUNT. In 2011, total funds transferred by Exim to the SAN SIMON ACCOUNT amounted to approximately $12,000,000.

42. Exim, like PACIFIC, is believed to be a shell company, based on, among other things, the following facts: (a) even though Exim identifies itself as a transportation service, it has received multiple wire transfers from REPUBLIC METALS, a gold refining company; (b) as of January 2012, Exim listed its sales volume as only $83,000 per year, despite the fact that Exim received approximately $12,000,000 in wire transfers from REPUBLIC METALS during a four month period; (c) Carlos Alayo and Julio are the only two officers listed for the company; (d) Julio is also one of the officers listed for PACIFIC; (e) at

least two other businesses, Solid Service and Capital Gold, also purport to operate from the address in Miami, Florida that Exim lists as its business address; (f) Solid Service is a company managed and operated by Julio, his wife, and son, while Capital Gold is a company managed and operated by another Sanchez-Paredes family member, Lola Rosmery Sanchez Alayo ("Lola Alayo"); (g) at least one of the vehicles registered to PACIFIC is also registered to the business address of Exim; (h) Exim has minimal Internet presence; (i) Exim was dissolved within a two year period; and (j) Carlos Alayo is a corporate officer for both Exim and Advancer Logistics LLC ("ADVANCER").

43. Julio is believed to have set up Exim as a shell company for the purposes of transferring drug money to Peru for the Sanchez-Paredes DTO.

### ADVANCER ACCOUNT-1 AND ADVANCER ACCOUNT-2

44. ADVANCER ACCOUNT-1 is held in the name of ADVANCER at JP Morgan Chase Bank. ADVANCER ACCOUNT-2 is held in the name of ADVANCER at BB&T International Services.

45. According to business records, ADVANCER is another company that is owned and operated by members of the Sanchez-Paredes family in Miami, Florida. ADVANCER is classified as a transportation business with a sales volume of $78,000 per year. The Sanchez-Paredes family members listed as

officers for the company include Carlos Alayo, Manuel, Simon, and Lola Alayo, all of whom have been the targets of a Peruvian money laundering investigation involving the laundering of narcotics proceeds for the Sanchez-Paredes DTO. Furthermore, they are the siblings of Segundo Manuel, who was placed on the narcotics trafficking watch list in Peru.

46. Another officer listed for ADVANCER ("Officer-1") is a Peruvian who has been arrested for cocaine trafficking in Florida. According to DEA records, this arrest occurred on or about February 6, 2010, and involved the purchase of one kilogram of cocaine from an undercover agent (the "UC") in exchange for $20,000. During the operation, Officer-1 informed the UC that Officer-1 and Officer-1's associates would purchase ten kilograms of cocaine from the UC on the next occasion. At the time of Officer-1's arrest, $10,155 was seized from Officer-1 and Officer-1's associates. The cocaine trafficking charges against Officer-1 are still pending.

47. ADVANCER has received wire transfers from REPUBLIC METALS in the following two accounts: (a) ADVANCER ACCOUNT-1; and (b) an account at Wells Fargo previously held by ADVANCER, bearing the account number 8149879911 (the "9911 Account"), which is now closed. From November 2011 through February 2012, a four month period, REPUBLIC METALS wired

approximately $8,000,000 into the 9911 Account. From March 1, 2012 to March 20, 2012, a period of three weeks, REPUBLIC METALS wired approximately $1,200,000 into ADVANCER ACCOUNT-1.

48. ADVANCER, like PACIFIC and Exim, appears to be a shell company, based on, among other things, the following facts: (a) even though ADVANCER identifies itself as a transportation service, ADVANCER, like PACIFIC and Exim, has received millions of dollars in wire transfers from REPUBLIC METALS, a gold refining company; (b) ADVANCER lists its sales volume as $78,000 per year despite the fact that ADVANCER received a total of $9,200,000 in wire transfers from REPUBLIC METALS over a five month period; (c) some of the officers of ADVANCER, specifically, Carlos Alayo, Manuel, and Simon, are also listed as officers of Exim; and (d) the company has minimal Internet presence.

49. Officer-1, who is identified as the registered agent for ADVANCER and who was arrested for cocaine trafficking, is believed to have set up ADVANCER as a shell company to transfer funds to Peru for the Sanchez-Paredes DTO.

### CARLOS ALAYO ACCOUNTS

50. The CARLOS ALAYO ACCOUNTS are held in the name of Carlos Alayo at Bank of America.

51.  As indicated previously, Carlos Alayo has been identified as an officer of both Exim and ADVANCER.  Although both Exim and ADVANCER are categorized as transportation service companies, they transact business with REPUBLIC METALS, a gold refining company.

52.  Wire transfer records show that in August 2011, one of the CARLOS ALAYO ACCOUNTS, account number 898015055702 (the "5702 Account"), received at least two wires, totaling approximately $15,000, from Exim.  The wires from Exim were noted as "Dividendos."  Additionally, three checks drawn on an account held in the name of Jorge E. Alva were used to transfer $23,000 to the 5702 Account.  As discussed above in paragraph 35, Jorge E. Alva is believed to launder narcotics proceeds for the Sanchez-Paredes DTO.

53.  A Bank of America representative has advised that a transfer of $50,000 was recently made from the 5702 Account to another one of the CARLOS ALAYO ACCOUNTS at Bank of America.

54.  Any and all funds contained in the CARLOS ALAYO ACCOUNTS are believed to consist of laundered narcotics proceeds, due to the fact that:  (a) Carlos Alayo manages what appear to be shell companies for the Sanchez-Paredes DTO; (b) Carlos Alayo oversees the transfer of what appear to be narcotics proceeds from Exim and ADVANCER to the SAN SIMON

25

ACCOUNT and COMARSA ACCOUNT-2 in Lima, Peru; (c) Carlos Alayo
and other Sanchez-Paredes family members have been under
investigation for narcotics trafficking and/or money laundering;
and (d) Carlos Alayo appears to have no source of legitimate
income.

### THE REPUBLIC METALS ACCOUNT

55. The REPUBLIC METALS ACCOUNT is held in the name
of REPUBLIC METALS at Wells Fargo Bank.

56. REPUBLIC METALS, located in Opa Locke, Florida,
is a precious metal company, which deals in the business of
refining and recycling materials from the jewelry, mining,
electronic, and industrial sectors locally and internationally.
The financial accounts for REPUBLIC METALS include the REPUBLIC
METALS ACCOUNT and an account at Bank United bearing the account
number 0709911254 (the "1254 Account"), which is now closed.

57. An article published by US News & World Report in
1999 entitled "The Golden Age of Crime, Why International Drug
Traffickers are Invading the Global Gold Trade," stated that the
gold trade has become "the money laundering mechanism of
choice." In the article, the owner of REPUBLIC METALS (the
"Owner") discussed how the Owner believes narcotics proceeds are
laundered through the purchase of gold. In the article, the
Owner is cited as saying "There's a dual economic system in the

jewelry business. There's on the books and there's off the books."

58.   In July 2010, the Miami Field Division of the DEA served an administrative subpoena on REPUBLIC METALS and spoke to representatives of the company with regard to all account activity related to PACIFIC, SAN SIMON, Miguel, Segundo Manuel, Simon, Carlos Alayo, and Lola Alayo.  During the interviews of the REPUBLIC METALS representatives, one representative ("Representative-1") was asked whether REPUBLIC METALS had any customers that did not appear to be legitimate.  Representative-1 said yes, and explained that REPUBLIC METALS currently deals with a Peruvian-based company, SAN SIMON, which has subsidiaries operating in Miami, PACIFIC and San Simon Corp.  Representative-1 indicated that he/she was aware that Immigration and Customs Enforcement was investigating PACIFIC, SAN SIMON, and the Sanchez-Paredes family for money laundering and drug trafficking.  According to Representative-1, SAN SIMON hired a private firm to generate a lengthy report, costing the company $700,000, to make it appear as though SAN SIMON was a legitimate business, which was necessary so that its business relationship with REPUBLIC METALS could continue.

59.   Following the interviews with the DEA in July 2010, REPUBLIC METALS, in August and September 2010, wire

transferred, from the 1254 Account, approximately $12,000,000 to PACIFIC ACCOUNT-1 in Miami, Florida. Thereafter, between August 2011 and November 2011, a four month period, REPUBLIC METALS wire transferred from the REPUBLIC METALS ACCOUNT approximately $11,000,000 to the Exim Logistics Account.

60. Following its wire transfers in 2011 to the Exim Logistics Account, REPUBLIC METALS, using the REPUBLIC METALS ACCOUNT, wire transferred funds to ADVANCER ACCOUNT-1 and to the 9911 Account, which is also held by ADVANCER. Specifically, from November 2011 through February 2012, a four month period, REPUBLIC METALS wired approximately $8,000,000 into the 9911 Account, and from March 1, 2012 to March 20, 2012, a period of three weeks, Republic Metals wired transferred approximately $1,200,000 to ADVANCER ACCOUNT-1.

61. Because REPUBLIC METALS has, among other things: (a) demonstrated its knowledge of the laundering of narcotics proceeds through the gold trade; (b) admitted that it had knowledge of the fact that the Sanchez-Paredes family was under investigation for both narcotics trafficking and money laundering; (c) received subpoenas from the DEA with regards to Sanchez-Paredes family, and specifically with respect to Segundo Maneul, Miguel; Carlos Alayo, and Lola Alayo; and (d) wire transferred millions of dollars to PACIFIC, EXIM and ADVANCER,

it is believed that the REPUBLIC METALS ACCOUNT has been used to transfer laundered narcotics proceeds to the Sanchez-Paredes DTO in Lima, Peru.

### ITALPREZIOSI ACCOUNT-1 AND ITALPREZIOSI ACCOUNT-2

62.   ITALPREZIOSI ACCOUNT-1 is held in the name of ITALPREZIOSI SPA at Unicredit AKA Hypovereins (New York Branch). ITALPREZIOSI ACCOUNT-2 is held in the name of ITALPREZIOSI SPA at Banca Intesa (New York Branch).

63.   During 2009 and 2010, a number of wire transfers were made by ITALPREZIOSI, using ITALPREZIOSI ACCOUNT-1 and ITALPREZIOSI ACCOUNT-2, to COMARSA ACCOUNT-2.  Specifically, ITALPREZIOSI wired between $54,000,000 and $55,000,000 from ITALPREZIOSI ACCOUNT-1, ITALPREZIOSI ACCOUNT-2, and a third account it controlled to COMARSA ACCOUNT-2.  Furthermore, in January 2009, ITALPREZIOSI made two wire transfers totaling $761,752 from ITALPREZIOSI ACCOUNT-2 to another bank account held by COMARSA at Wells Fargo.

64.   Financial sources indicate that ITALPREZIOSI made approximately $3,269,319 in wire transfers to a company known as Future Options NV ("Future Options").  These wires were generally for round amounts, which were multiples of $10,000 with the majority being amounts greater than $300,000.  Wells Fargo, which conducted an investigation of Future Options based

29

on an internal alert, found that although research indicated that ITALPREZIOSI was involved in the precious metals trading industry, no link existed between Future Options and ITALPREZIOSI and the precious metals trading industry. Wells Fargo further concluded, based on its investigation, that ITALPREZIOSI was involved in trade based money laundering activity.

65. The transactions conducted by ITALPREZIOSI with COMARSA and Future Options appear to have been geared towards trade based money laundering activity, due to, among other things, the following facts: (a) a high risk financial involvement with an internationally known DTO, that is, the DTO run by members of the Sanchez-Paredes family; (b) no link or business purpose with Future Options; and c) almost a one-to-one ratio where the incoming wire amounts equaled the outgoing wire amounts.

66. Since June 2009, law enforcement authorities in Italy, in conjunction with the DEA, have been investigating a suspected money laundering organization based in Arezzo, Italy, led by two brothers, Hussein Ayman El Hajj and Hussain Hazem El Hajj. Information provided by Italian law enforcement authorities suggests that the El Hajj brothers launder drug proceeds through the purchase and sale of unrefined gold.

Intelligence further indicates that the El Hajj brothers are suspected of using the precious metals exchange company ITALPREZIOSI to conduct money laundering activities.

67. In addition, an examination of sales and profit data of ITALPREZIOSI between 2006 and 2008 shows a significant increase in unexplained sales and profits. Specifically, in 2006, ITALPREZIOSI reported no sales and a profit of $-67,482. In 2008, by contrast, ITALPREZIOSI reported $564,880,903 in sales and a profit of nearly $4,500,000. ITALPREZIOSI's 2008 sales figures, moreover, were widely disproportionate to the 2008 sales figures of other Italian companies in the same industry, which ranged from only $2,167,539 to $29,831,135. And the 2008 profit reported by ITALPREZIOSI, which only amounted to .8% of its sales figure, suggests that ITALPREZIOSI is spending a disproportionate amount on operating costs for its business in comparison to other Italian companies in the same industry. One of those companies, by comparison, reported a $9,048,183 profit on sales of only $26,040,259.

68. ITALPREZIOSI, using ITALPREZIOSI ACCOUNT-1 and ITALPREZIOSI ACCOUNT-2, is believed to be facilitating the laundering of narcotics proceeds for the Sanchez-Paredes DTO, based on, among other things, the following facts: (a) ITALPREZIOSI is alleged to have laundered narcotics proceeds for

the El Hajj brothers, who, in turn, allegedly launder drug proceeds through the purchase and sale of unrefined gold; (b) Wells Fargo concluded, from a review and analysis of financial activity between ITALPREZIOSI and Future Options, that ITALPREZIOSI is involved in trade based money laundering; (c) ITALPREZIOSI's 2008 finances indicate an unexplained, massive increase in ITALPREZIOSI's sales volume, which is disproportionate to that of other Italian companies in the same industry, and disproportionate to the amount of profit that ITALPREZIOSI reported for 2008; and (d) within a two year period, ITALPREZIOSI wired approximately $55,000,000 to the SAN SIMON ACCOUNT, which is held by members of the Sanchez Paredes DTO.

## THE HORIZONTE DORADO ACCOUNT

69. The HORIZONTE DORADO ACCOUNT is held in the name of HORIZONTE DORADO SRL ("HORIZONTE DORADO") at Banco De Comercio in Lima, Peru.

70. According to financial records, the HORIZONTE DORADO ACCOUNT has received wire transfers from ADVANCER, which, as discussed above, is believed to be a shell company, and is operated by Carlos Alayo. Carlos Alayo, as is also noted above, has been under investigation in Peru for the laundering of narcotics proceeds for the Sanchez Paredes family.

32

71. Specifically, between April 2012 and July 2012, the HORIZONTE DORADO ACCOUNT received approximately fourteen wire transfers from ADVANCER, totaling $7,475,000. Two of those wire transfers, for $600,000 and $100,000, respectively, were received from ADVANCER on the same day, May 21, 2010.

72. Public records checks and database searches have indicated that HORIZONTE DORADO is a company managed by Sanchez Paredes family member Manuel, who has also been listed as an officer of Exim and ADVANCER, and who is target of a Peruvian money laundering investigation involving the laundering of narcotics proceeds by the Sanchez-Paredes DTO. Like Exim and ADVANCER, HORIZONTE DORADO appears to be a shell company used by the Sanchez Paredes DTO to launder narcotics proceeds. Searches of records relating to HORIZONTE DORADO have not located a description of the company's services, any estimated sales volume for the company, any contact information for the company, or any address for the company. HORIZONTE DORADO also has no Internet presence.

### THE SAN SIMON ACCOUNT AND COMARSA ACCOUNT-2

73. The SAN SIMON ACCOUNT is held in the name of SAN SIMON at Banco De Comercio in Lima, Peru. COMARSA ACCOUNT-2 is held in the name of COMARSA at Banco De Comercio in Lima, Peru.

74. Wire transfers totaling millions of dollars have been made by ITALPREZIOSI and Exim to the SAN SIMON ACCOUNT and COMARSA ACCOUNT-2. For instance, from January 2009 to December 2010, ITALPREZIOSI wired between $54,000,000 and $55,000,000 to COMARSA ACCOUNT-2, and from June 2011 to November 2011, Exim executed multiple wire transfers totaling approximately $12,000,000 to the SAN SIMON ACCOUNT.

75. SAN SIMON, which purports to be a mining company, has been investigated on multiple occasions for narcotics trafficking and money laundering related activities. In July 2007, SAN SIMON was investigated for drug trafficking and the improper channeling of chemicals and other controlled substances with the intent to distribute. In November 2007, SAN SIMON was investigated in Canete, Peru for money laundering related to irregular land purchases. And in January 2008, SAN SIMON was investigated in Peru on charges of laundering narcotics proceeds for the Sanchez Paredes family through 124 different companies.

76. Sanchez-Paredes family member Segundo Manuel is the General Manager of SAN SIMON, and Sanchez-Paredes family members Miguel and Fidel are agents for SAN SIMON. Miguel is also an officer of PACIFIC, which, as discussed above, is believed to be a shell company for narcotics proceeds generated by the Sanchez-Paredes DTO. As is also discussed above, Segundo

34

Manuel, Miguel, and Fidel have all been investigated for narcotics trafficking and money laundering, and both Segundo Manuel and Fidel have been placed on Peru's drug trafficking watch list.

77. Moreover, from 2003 to 2007, SAN SIMON transacted business with Metalor USA Refining, a metal refining company that was charged with and pled guilty to laundering drug money during the period from 2003 to 2004.

78. COMARSA, which, like SAN SIMON, purports to be a mining company, has also been investigated on multiple occasions for narcotics trafficking and money laundering related activities. In July 2007, COMARSA was investigated in Peru for narcotics trafficking, and reportedly diverted tons of chemical products for narcotics production. As discussed above, information learned from C-1S confirms that COMARSA did, indeed, process cocaine base into cocaine HCL, and that COMARSA needed security to protect shipments of cocaine base that were transported by mules to the COMARSA mine in Lima, Peru. In January 2008, COMARSA was investigated in Peru on charges of laundering narcotics proceeds for the Sanchez-Paredes family through 124 different companies. And in April 2010, COMARSA was charged with money laundering by Peruvian law enforcement authorities.

79.	A number of Sanchez-Paredes family members are affiliated with COMARSA, including Santos Orlando, who is listed as COMARSA's Executive President and Founder; Fidel, who is listed as COMARSA's Administration Manager and Founder; Miguel, who is listed as COMARSA's Logistics Manager and Founder; and Fortunato, who is listed as one of COMARSA's Founding Members. As discussed above, Santos Orlando, Fidel, Miguel, and Fortunato have all been investigated for narcotics trafficking and money laundering, and Santos Orlando, Fidel, and Fortunato have all been placed on Peru's drug trafficking watch list.

80.	Accordingly, the SAN SIMON ACCOUNT and COMARSA ACCOUNT-2 are believed to be facilitating the laundering of narcotics proceeds for the Sanchez-Paredes DTO, and the funds in these accounts are believed to be the proceeds of narcotics trafficking activities.

### III.  FIRST CLAIM FOR FORFEITURE

81.	Plaintiff repeats, realleges and incorporates by reference herein each and every allegation contained in paragraphs one through eighty of this Verified Complaint.

82.	Title 18, United States Code, Section 981(a)(1)(A) provides that "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property

36

traceable to such property," is subject to forfeiture to the United States.

83. Title 18, United States Code, Section 1956 imposes a criminal penalty on

(a) (1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

(A) (i) with the intent to promote the carrying on of specified unlawful activity; or . . .

(B) knowing that the transaction is designed in whole or in part—
(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . . . [or]

(b) (2) Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States-

(A) with the intent to promote the carrying on of specified unlawful activity; or

(B) knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part—
(i) to conceal or disguise the nature, the location, the source, the ownership, or the

37

control of the proceeds of specified unlawful activity . . . .

84. Title 18, United States Code, Section 1957 imposes a criminal penalty on

(a) Whoever . . . knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity . . . .

85. Title 18, United States Code, Section 1956(h) further provides that

Any person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

86. As demonstrated by the Verified Complaint, there is probable cause to believe that the Defendant Property is subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(A) because it constitutes property used in violation of the provisions of Title 18, United States Code, Sections 1956 and 1957.

## IV. SECOND CLAIM FOR FORFEITURE

87. Plaintiff repeats, realleges and incorporates by reference herein each and every allegation contained in paragraphs one through eighty-six of this Verified Complaint.

88. Pursuant to Title 21, United States Code, Section 881(a)(6), "[a]ll moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter" are subject to seizure and forfeiture to the United States, and no property right exists in such monies or proceeds.

89. As demonstrated by the Verified Complaint, there is probable cause to believe that the Defendant Property is subject to forfeiture pursuant to Title 21, United States Code, Section 881(a)(6), because it constitutes moneys and other things of value intended to be furnished in exchange for a controlled substance, and/or proceeds traceable to such exchanges, and/or moneys used or intended to be used to facilitate violations of the federal narcotics laws.

WHEREFORE, Plaintiff United States of America prays that process issue to enforce the forfeiture of the Defendant Property and that all persons having an interest in the Defendant Property be required to appear and show cause why the forfeiture of the Defendant Property should not be decreed, that

this Court decree forfeiture of the Defendant Property to the

United States of America for disposition according to law, and

that this Court grant Plaintiff such further relief as it may

deem just and proper, together with the costs and disbursements

of this action.

Dated:     New York, New York
           October 9, 2012.

                              PREET BHARARA
                              United States Attorney for
                              Plaintiff United States of America


                   By:    _____
                              SARAH E. PAUL
                              Assistant United States Attorney
                              One St. Andrew's Plaza
                              New York, New York 10007
                              (212) 637-2326

# VERIFICATION

STATE OF NEW YORK          )
COUNTY OF NEW YORK        )
SOUTHERN DISTRICT OF NEW YORK )

     KEITH HART, being duly sworn, deposes and says that he is a Special Agent with the Drug Enforcement Administration ("DEA") and as such has responsibility for the within action; that he has read the foregoing Verified Complaint and knows the contents thereof, and that the same is true to the best of his own knowledge, information and belief.

     The sources of deponent's information and the ground of his belief are official records and files of the DEA and other law enforcement agencies, and information obtained directly by deponent and other case agents during an investigation of alleged violations of Title 18, United States Code.

_____
KEITH HART
Special Agent
Drug Enforcement Administration

Sworn to before me this
5th day of October, 2012

_____
Notary Public

MARCO DASILVA
Notary Public, State of New York
No. 01DA6145603
Qualified in Nassau County
My Commission Expires May 8, 2014

41